UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| MARINI TAZAMISHA STURNS, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | |
| § | Civil Action No. 3:21-cv-02307 |
| THE KROGER COMPANY, § | |
| KROGER SPECIALTY INFUSION, § | |
| and RYAN MCGRATH, § | |
| § | |
| Defendants. § | |

# COMPLAINT

Plaintiff Marini Tazamisha Sturns ("Plaintiff" or "Ms. Sturns"), by her counsel, Rogge Dunn Group, P.C., alleges for her Complaint against The Kroger Company ("Kroger"), Kroger Specialty Infusion ("KSI"), and Ryan McGrath (collectively, "Defendants"), as follows:

## NATURE OF THE ACTION

1. Under 42 U.S.C. §1981, all persons within the United States have the same right to make and enforce contracts as is enjoyed by white citizens.[1]  Denying an individual monetary benefits and recognition solely because of their race is strictly prohibited.

2. Defendants discriminated against Ms. Sturns, who is Black, at KSI due to her race. Her boss, Ryan McGrath KSI Vice President of Sales (hereinafter "Mr. McGrath"), constantly complained that Ms. Sturns was making too much money, not that she was being paid unfairly as compared to other employees, but simply that she earned too much.  It is clear that Mr. McGrath felt that Ms. Sturns made too much because she is Black.

---

[1] The term "make and enforce contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

**COMPLAINT** – Page 1

3. Starting in 2018, Ms. Sturns began to experience overt, and in some cases subtle, discrimination at the hand of Mr. McGrath. Mr. McGrath's discriminatory statements and conduct have been extensively and carefully documented.

4. Under 42 U.S.C. § 1981, Ms. Sturns seeks damages, attorneys' fees, and costs from Defendants for ongoing race discrimination, unequal pay, hostile work environment, and retaliation. Ms. Sturns is entitled to a large damage award, including but not limited to back and front pay, fair pay, all unpaid compensation owed, emotional distress injuries, attorney's fees, costs and expenses.

## PARTIES

5. At all times relevant hereto, Ms. Sturns was and is a resident of Dallas County in the State of Texas.

6. Upon information and belief, at all times relevant hereto, Kroger was and is a national retail company with its principal place of business at 1014 Vine Street Cincinnati, Ohio 45202. Kroger operates 2,726 supermarkets and multi-department stores, maintaining markets in thirty-five (35) states and the District of Columbia.

7. Upon information and belief, at all times relevant hereto, KSI was and is a corporation organized under the laws of the State of Florida with its principal place of business at 3200 Lake Emma Road, Suite 1000, Lake Mary, Florida 32746.

8. KSI is a subsidiary of Kroger, providing Specialized Home Infusion for Subcutaneous Immune Globulin and IV Immune Globulin for autoimmune and primary immune deficiency diseases.

9. Ryan McGrath is a Vice President of Sales at KSI and may be served at his home address at 210 N. Ole Hickory Trail, Carrollton, Georgia 30117.

10. Kroger and KSI are joint employers of Plaintiff Sturns.

## STATEMENT OF FACTS

### A. Background

11. Ms. Sturns graduated Cum Laude in 1993 from Clark Atlanta University and began her pharmaceutical career in 2002 with Merck & Company, which is one of the top 10 largest pharmaceutical companies in the world.

12. She has repeatedly been recognized as the number one sales representative at Merck, at Allergan Neurosciences, and at KSI from 2015 to 2019, with the exception of 2018 when Ms. Sturns was the second most successful.

### B. Race Discrimination at KSI

13. Senior-level employees confirm race discrimination at KSI.

14. On November 11, 2020, Ms. Sturns was on a call with a Black Kroger Specialty Pharmacy Director (hereinafter, "KSP Director"), who felt that KSI had abused Ms. Sturns. He said that the overall sentiment KSI leadership (predominantly white) had towards Ms. Sturns was that "this n*gga's been paid long enough" and that "she won't spend any money…against the white way of doing things."

15. He also mentioned that KSI's treatment of Black employees has been "keeping [him] up at night."

16. Because it had been weighing so heavily on him, KSP Director said that he supported Ms. Sturns seeking legal counsel, because KSI thinks that Ms. Sturns is going to "sit her

little Black butt over there and make whatever we are going to give her or she can go sit down and make substantially less somewhere else."

17. To the knowledge of Ms. Sturns, there are no remaining Black employees at KSI.

18. Overall, KSP Director expressed to Ms. Sturns that he believes KSI leadership has a strong mentality of white superiority and that it clearly manifested itself in how Ms. Sturns was treated.

### C. McGrath's Racist Statements and Conduct

19. KSI and Mr. McGrath treated Ms. Sturns less favorably than her similarly situated white counterparts. KSI and Mr. McGrath insisted on maintaining a working environment littered with offensive racial stereotypes and offensive statements.

20. Ms. Sturns was regularly offended by Mr. McGrath's racial stereotypes and statements.

21. For example, on a call discussing her gram total during summer 2020, Mr. McGrath brought up race, stating that Ms. Sturns had experience "living and being involved in the Civil Rights Movement in Georgia, and [she has], of course, been following John Lewis in the past and now."

22. However, Ms. Sturns had not heretofore discussed these issues with Mr. McGrath.

23. Furthermore, the Civil Rights Movement (1954-1968) ended before Ms. Sturns was even born.

24. On another call that summer, Mr. McGrath mentioned that, even though she did not earn more because she did not hit her goals, making $24,000 a month is good enough living and

that she did not need any more. He stated, "you're making plenty of money, how is that not motivating?"[2] The subtext was clear: as a black woman, what do you have to complain about?

25.     In and around Summer 2020, Mr. McGrath again overtly shared his sentiment towards Black Americans in an open team setting by discussing the recent George Floyd murder and Colin Kaepernick's protest in a manner that offended Ms. Sturns.

26.     During that same team conference call, Mr. McGrath opened up the discussion by addressing the Juneteenth holiday and told a story that made virtually every employee listening very uncomfortable. Mr. McGrath stated that his grandfather's birthday was on or around June 19, so when he, as a child, would see Black Americans celebrating the day in the streets of the Texas town he grew up in he would say "look, grandpa, they are celebrating your birthday." Mr. McGrath laughed at his own story, though no other KSI employees appeared to find the story, or "joke," amusing.

27.     Mr. McGrath continued to insert racially offensive and/or insensitive topics and comments into nearly every single discussion on compensation.

28.     Ms. Sturns had a call with Mr. McGrath on July 7, 2020, on which he immediately opened by discussing racial tensions and "unaddressed issues" which he described as, "a trip."

29.     He went on to deceptively discuss "issues" with compensation and that he would modify Ms. Sturns' goals for that quarter, which he never did.

30.     Mr. McGrath's deceptive conduct negatively impacted Ms. Sturns' Incentive Compensation ("IC") payment for that quarter.

---

[2] Ms. Sturns also reminded him about some New Mexico grams which would have increased her income. She was told that they were not applied yet, but Mr. McGrath said he would apply them. Several days later, he said they were included already. There was no documentation to support this, and Ms. Sturns did not get to the next tier with her gram totals. Mr. McGrath wanted Ms. Sturns to accept that she would have a lower income, and, once she challenged him on it, Mr. McGrath completely disregarded material evidence that would have given Ms. Sturns her deserved compensation.

**COMPLAINT** – Page 5

31. Two days later, July 29, 2020, Ms. Sturns and Mr. McGrath had a conversation which initially focused on readjusting the goals for next quarter which, after Mr. McGrath's vigorous prodding, quickly pivoted into, yet again, a conversation about race.

32. Mr. McGrath's inability to retract from conversations about race and racial division directly influenced and decreased Ms. Sturns' income.

### D. Unequal Pay

33. In and around February 2020, KSI announced they would no longer be taking patients from Texas Center for Infectious Disease Associates ("TCIDA"), Ms. Sturns' top source of referrals for 2019.

34. The main issue stemming from referrals, however, was that Ms. Sturns had not been credited for her referrals she had made in December 2019 with TCIDA.

35. Mr. McGrath cited an obscure technicality which prevented payment on the referrals. However, another employee, a white male named Alen Mustac ("Mustac"), received at least twenty-five (25) referrals with the same obscure technicality. He was credited for every single one.

36. Ms. Sturns' referrals were in December 2019 and Mustac's were in May/June 2020.

37. All that time, Mr. McGrath had been complaining that Ms. Sturns was making too much money, and that he, in his role, should have been making more.

38. Mr. McGrath's constant complaints about Ms. Sturns' income coupled with his discussions around race constitutes a *prima facie* case of racial discrimination.

39. There can be no justifiable reason why Ms. Sturns was not credited for her referrals when Mustac, a similarly situated white worker, was credited for referrals.

40. KSI cannot argue that the work was different solely because the referrals occurred at different times. If the substance of work remains the same, the timing of the work is irrelevant.

41. Documentation demonstrates that Ms. Sturns was not paid in full for promised payments on August 21, 2020, September 18, 2020, November 4 and 25, 2020, and March 3, 2021.

42. Ms. Sturns was singled out for being a Black woman who made "too much money," and was, therefore, limited in her rightful compensation, whereas white men were given compensation in excess of they deserved.

43. This is, irrefutably, a *prima facie* case of racial discrimination in regards to compensation.

### E. Retaliation

44. The more Ms. Sturns complained about unfair treatment and unequal pay, the harsher Mr. McGrath's treatment became.

45. In response to Ms. Sturns' complaints, on June 29, 2020, Mr. McGrath boldly and falsely accused Ms. Sturns of wrongdoing.

46. Mr. McGrath then attempted to document and manipulate Ms. Sturns into admitting to Mr. McGrath's false accusations.

47. Soon after, on September 10, 2020, Mr. McGrath's aggression towards Ms. Sturns mounted in a follow-up phone call.

48. For the next eight (8) minutes Mr. McGrath focused on a discussion around Black Lives Matter, foreign nationals, social justice, and whether people should wear masks or not. Each of the topics were entirely irrelevant to the business purpose of the call.

49. Ms. Sturns again was deeply offended and made to feel extremely uncomfortable.

### F. Subtle Discrimination

50. Mr. McGrath also subjected Ms. Sturns to more subtle, though equally offensive, forms of discrimination.

51. Mr. McGrath was hesitant to recognize Ms. Sturns' success, unless completely unavoidable, and would never acknowledge that success publicly.

52. In May 2020, Mr. McGrath had no choice but to recognize Ms. Sturns for her record-breaking sales and leadership qualities, as the internal accounting reports speak for themselves. However, Mr. McGrath would never offer any professional praise of Ms. Sturns in an open or group setting.

53. All praise Ms. Sturns received from Mr. McGrath was in private.

54. On a national call with KSI leadership, after the unmatched success Ms. Sturns had achieved, Mr. McGrath made no reference to Ms. Sturns' individual accomplishments.

55. A number of Ms. Sturns coworkers later consoled her about Mr. McGrath's silence, saying that what he had done was unjust and rude.

56. When Ms. Sturns asked Mr. McGrath why he failed to recognize her achievements despite other sales representatives from other regions being singled out to be praised for their accomplishments, Mr. McGrath replied that it "was not an award ceremony."

57. Other top performers were recognized, but not Ms. Sturns.

58. Mr. McGrath did not want Ms. Sturns to succeed. He grossly underrecognized her success, belittled her opinions, and openly stymied her efforts to make additional compensation.

59. Ms. Sturns wanted to work with Ms. Robinson, but Mr. McGrath belittled her performance and character by saying things like "she plays both sides of the fence, you two will not get along."

60. Ms. Sturns instead was forced to work with the less experienced Jessica Espito.

61. Ms. Sturns certainly would have performed better working with Ms. Robinson.

62. Mr. McGrath later retained and championed Ms. Robinson at KSI, giving her most of Ms. Sturns' job responsibilities.

63. Mr. McGrath only spoke negatively about Ms. Robinson to justify limiting Ms. Sturns' ability to hit better numbers and, therefore, earn more money.

### G. Hostile Work Environment

64. Ms. Sturns was subject to direct race-based comments by Mr. McGrath on a regular basis that constitute a hostile work environment.

65. He began unprompted and irrelevant discussions on race during times when America was viciously divided because of the George Floyd murder.

66. He belittled a national holiday celebrating the end of slavery.

67. There were also repeated comments made by Mr. McGrath directed at Ms. Sturns in which he complained about her income and believed that she does not deserve to make more money than he made.

68. Ms. Sturns was forced to work in an environment in which Mr. McGrath would discuss something so central to her person, her race, in a negative, divisive, and politicized way.

69. Mr. McGrath allowed Ms. Sturns' skin color to be direct basis for complaints about her income.

70. Ms. Sturns, a Black woman, is a member of a protected class.

71. Ms. Sturns was subject to unwelcome harassment, the harassment was based on race, and the harassment affected Ms. Sturns' terms of employment.

72. Ms. Sturns' employment was altered because of conduct that she, a reasonable person as exemplified by the solidarity shown by her coworkers, would deem objectively and subjectively offensive.

73. KSI is liable for Mr. McGrath's actions: if an employee provides a hostile work environment claim against her immediate supervisor, the employer is subject to vicarious liability.

74. Ms. Sturns went to work everyday knowing that Mr. McGrath would make some comment about her income, or that she would have to endure an incredibly offensive conversation about her race and skin color.

75. This manifested in actual harm when Ms. Sturns lost income because of Mr. McGrath's disparate treatment.

76. Going to work every day under constant threat of harassment and disproportionate treatment is precisely why the statute was created.

77. As mentioned earlier, a KSP Director also recognized that Ms. Sturns was being treated differently because of race and that disparate treatment was negatively impacting her employment.

### H. Constructive Discharge

78. Ms. Sturns loved working with her patients and providers and explicitly acknowledges that, but for the repeated discrimination against her, she would have continued working with KSI.

79. However, as of February 2021, Ms. Sturns could no longer endure the constant discrimination and harassment and was forced to resign.

80. On February 22, 2021, when she could no longer endure the constant harassment, Ms. Sturns submitted a letter of resignation detailing the financial consequences of the discrimination and unjust treatment.

81. Ms. Sturns then met with Marcus Williams ("Williams") from Human Resources ("HR") to discuss her resignation, specifically stating that, she planned on spending the rest of her career there.

82. Williams asked Ms. Sturns to send Mr. McGrath a letter of resignation <u>without detailing the discrimination</u> she faced, so that he could "investigate" any claims she had made. Williams told Ms. Sturns he would "update her" after completing an investigation.

83. Ms. Sturns did not remove discrimination from the letter.

84. Williams never updated Ms. Sturns.

85. On February 23, 2021, Mr. McGrath called Ms. Sturns about her resignation letter.

86. Ms. Sturns repeatedly asked if she and Mr. McGrath could discuss the resignation at a later date, but he relentlessly tried to deny his discriminatory actions.

87. As Ms. Sturns tried to exit the conversation, Mr. McGrath continued to intimidate her by trying to convince her that she was wrong and he had not discriminated against her.

88. Between HR and Mr. McGrath's call following her resignation, KSI showed no interest or intent in investigating Ms. Sturns' substantial claims of discrimination.

89. Rather, the focus was solely on discrediting Ms. Sturns' feelings and what occurred.

90. On March 3, 2021, Ms. Sturns was told she would be paid $57,410 for her first period gram totals.

91.     As a further act of retaliation, she ultimately received only $33,995.[3]

## CLAIMS

### FIRST CLAIM
**Disparate Treatment, Hostile Work Environment, and Unequal Pay Due to Race in Violation of 42 U.S.C. § 1981**

92.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 91 with the same force as though separately alleged herein.

93.     42 U.S.C. § 1981 prohibits employers from denying an individual monetary benefits and recognition solely because of their race.

94.     Defendants denied Plaintiff individual monetary benefits and recognition based on her race.

95.     Defendants subjected Plaintiff to a hostile work environment.

96.     Defendants retaliated against Plaintiff for raising her rights.

97.     Defendants violated 42 U.S.C. §1981.

98.     As a direct and proximate consequence of Defendants' discriminatory treatment, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, back and front pay, fair pay, unpaid compensation, emotional distress injuries, attorney's fees, costs and expenses, all in amounts to be determined at trial.

99.     Defendants' discriminatory treatment of Plaintiff was willful, malicious, and/or in reckless disregard of Plaintiff's protected rights.

---

[3] On May 12, 2021 Ms. Sturns spoke with Casey Foote, a white man, who mentioned that Mr. McGrath had extended Mr. Foote's tenure so that he could be paid more.  Clearly, there was an institutional failure on KSI's part to change Mr. McGrath's discriminatory treatment.  Even if Mr. Williams spoke to Mr. McGrath, nothing became of that conversation because Ms. Sturns had payments wrongfully withheld from her whereas white colleagues were paid in excess.

**COMPLAINT** – Page 12

100. Accordingly, Plaintiff seeks an award of punitive damages against Defendants.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the following relief:

A. For the first cause of action, compensatory and punitive damages, attorneys' fees, and costs to be determined at trial; and

B. For such other and further relief as the Court deems just and proper.

Respectfully submitted,

_____
**WALKER G. HARMAN, JR.**
E-Mail: harman@roggedunngroup.com

**ROGGE DUNN GROUP, PC**
500 N. Akard Street
Suite 1900
Dallas, Texas 75201
Telephone: (214) 888-5000
Facsimile: (214) 220-3833

**ATTORNEYS FOR PLAINTIFF**